IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) ENTERTAINMENT MERCHANTS ASSOCIATION; and (2) ENTERTAINMENT SOFTWARE ASSOCIATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. CIV-06-675-C |
| (1) BRAD HENRY, in his official capacity as the Governor of the State of Oklahoma; (2) DREW EDMONDSON, in his official capacity as Attorney General of the State of Oklahoma; and (3) DAVID PRATER, in his official capacity as District Attorney of Oklahoma County, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Plaintiffs filed this action for declaratory and injunctive relief on June 23, 2006.

Plaintiffs have filed a motion for summary judgment (Pls.' Mot. & Br., Dkt. Nos. 35 & 36),

and Defendants have responded (Defs.' Resp., Dkt. No. 48).[1]  Plaintiffs have filed a reply to

Defendants' response (Pls.' Reply, Dkt. No. 51), and the matter is now at issue.  For the

reasons given below, the Court GRANTS Plaintiffs' motion and permanently enjoins

enforcement of the disputed act.

I. BACKGROUND

---

[1]  Since the time that Plaintiffs filed this action, David Prater has replaced C. Wesley
Lane, II, as District Attorney of Oklahoma County.  Mr. Prater has been substituted as a
defendant in the caption of this action pursuant to Fed. R. Civ. P. 25(d)(1).

Title 21 of the Oklahoma Statutes prescribes criminal penalties for any person who knowingly displays, sells, furnishes, distributes, or otherwise disseminates to minors any material considered "harmful to minors."  See 21 Okla. Stat. §§ 1040.76-.77.  On June 9, 2006, Oklahoma Governor Brad Henry signed into law House Bill 3004.  See H.B. 3004, 50th Leg., 2d Sess. (Okla. 2006).  Section 2 of H.B. 3004 is referred to by the parties as "the Act" and would amend 21 Okla. Stat. § 1040.75.  The Act adds a new category of material that is "harmful to minors":  "any description, exhibition, presentation or representation, in whatever form, of inappropriate violence."  The Act defines "inappropriate violence" as

> any description or representation, in an interactive video game or computer software, of violence which, taken as a whole, has the following characteristics:
> a. the average person eighteen (18) years of age or older applying contemporary community standards would find that the interactive video game or computer software is patently offensive to prevailing standards in the adult community with respect to what is suitable for minors, and
> b. the interactive video game or computer software lacks serious literary, scientific, medical, artistic, or political value for minors based on, but not limited to, the following criteria:
> (1) is glamorized or gratuitous,
> (2) is graphic violence used to shock or stimulate,
> (3) is graphic violence that is not contextually relevant to the material,
> (4) is so pervasive that it serves as the thread holding the plot of the material together,
> (5) trivializes the serious nature of realistic violence,
> (6) does not demonstrate the consequences or effects of realistic violence,
> (7) uses brutal weapons designed to inflict the maximum amount of pain and damage,
> (8) endorses or glorifies torture or excessive weaponry, or
> (9) depicts lead characters who resort to violence freely[.]

H.B. 3004 § 2.

Plaintiffs are trade associations representing companies that create, publish, manufacture, distribute, sell, and rent video games to the public. On June 23, 2006, Plaintiffs brought this action pursuant to 42 U.S.C. § 1983 challenging the validity of the Act on its face. (See Compl., Dkt. No. 1.) Plaintiffs seek a declaratory judgment of the Act's unconstitutionality and an injunction against its enforcement. The Act was scheduled to go into effect on November 1, 2006. See H.B. 2004 § 3. On Plaintiffs' motion, however, the Court entered a preliminary injunction prohibiting Defendants and their officers, employees, and representatives from enforcing the Act pending a final ruling on Plaintiffs' constitutional claims. (See Dkt. No. 44.) Plaintiffs now have filed a motion for summary judgment, pursuant to Fed. R. Civ. P. 56, to invalidate the Act as an unconstitutional violation of free speech under the First Amendment, and as unconstitutionally vague under the Fourteenth Amendment.[2]

As of this date, the Court is unable to find a case where a similar restriction has passed constitutional muster. See, e.g., Interactive Digital Software Ass'n v. St. Louis County (IDSA), 329 F.3d 954 (8th Cir. 2003); Am. Amusement Mach. Ass'n v. Kendrick, 244 F.3d 572 (7th Cir.), cert. denied, 534 U.S. 994 (2001); Video Software Dealers Ass'n v. Schwarzenegger, No. C-05-04188, 2007 WL 2261546 (N.D. Cal. Aug. 6, 2007); Entm't Software Ass'n v. Foti, 451 F. Supp. 2d 823 (M.D. La. 2006); Entm't Software Ass'n v. Hatch, 443 F. Supp. 2d 1065 (D. Minn. 2006); Entm't Software Ass'n v. Granholm, 426 F.

---

[2] Plaintiffs do not currently move for summary judgment on their equal protection claim.

Supp. 2d 646 (E.D. Mich. 2006); <u>Entm't Software Ass'n v. Blagojevich</u>, 404 F. Supp. 2d

1051 (N.D. Ill. 2005), <u>aff'd on other grounds</u>, 469 F.3d 641 (7th Cir. 2006); <u>Video Software</u>

<u>Dealers Ass'n v. Maleng</u>, 325 F. Supp. 2d 1180 (W.D. Wash. 2004).

## II. STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment should be granted "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to

a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'genuine' if the

evidence allows a reasonable jury to resolve the issue either way and is 'material' when 'it

is essential to the proper disposition of the claim.'" <u>Haynes v. Level 3 Commc'ns, LLC</u>, 456

F.3d 1215, 1219 (10th Cir. 2006) (citation omitted), <u>cert. denied</u>, 127 S. Ct. 1372 (2007).

The movant bears the initial burden of demonstrating the absence of material fact

requiring judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23

(1986). If the movant carries this initial burden, the nonmovant must then set forth "specific

facts" outside the pleadings and admissible into evidence which would convince a rational

trier of fact to find for the nonmovant. Fed. R. Civ. P. 56(e). These specific facts may be

shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere

pleadings themselves." <u>Celotex</u>, 477 U.S. at 324. "The burden is not an onerous one for the

nonmoving party in each case, but does not at any point shift from the nonmovant to the

district court." <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 672 (10th Cir. 1998). All facts

and reasonable inferences therefrom are construed in the light most favorable to the

nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. ANALYSIS

*A. First Amendment*

*1. Protected Speech*

The threshold issue before the Court is whether violent video games are considered constitutionally protected free speech.  It is well established that video games are a form of creative expression entitled to protection under the First Amendment, which protects "[e]ntertainment, as well as political and ideological speech."  Schad v. Borough of Mount Ephraim, 452 U.S. 61, 65 (1981); see also Granholm, 426 F. Supp. 2d at 650-51.  Violent video games are a type of artistic expression and contain "stories, imagery, 'age-old themes of literature,' and messages, 'even an "ideology,"' just as books and movies do.'"  IDSA, 329 F.3d at 957 (citation omitted); Blagojevich, 404 F. Supp. 2d at 1056; cf. Sanders v. Acclaim Entm't, Inc., 188 F. Supp. 2d 1264, 1279 (D. Colo. 2002).  Although Defendants suggest that the ability of players to manipulate the plot and progression of these games distinguishes them from other protected forms of expression (see Defs.' Resp. at 4-5), the presence of increased viewer control and interactivity does not remove these games from the realm of First Amendment protection.  See IDSA, 329 F.3d at 957-58; Kendrick, 244 F.3d at 577 ("All literature (here broadly defined to include movies, television, and the other photographic media, and popular as well as highbrow literature) is interactive; the better it is, the more interactive.").

5

In support of exclusion of certain violent video games from constitutional protection, Defendants cite James v. Meow Media, Inc., wherein the Sixth Circuit observed that "[e]xtending First Amendment protection to video games certainly presents some thorny issues." 300 F.3d 683, 696 (6th Cir. 2002). Despite its concerns, however, the court in James actually held that the First Amendment protects the communicative aspects of video games in the tort liability context and noted that "most federal courts to consider the issue have found video games to be constitutionally protected [expression]." Id.[3] Even Defendants concede that "[i]t is indisputable that some video games . . . contain plots, provide information[,] and otherwise entertain." (Defs.' Resp. at 5.) In an apparent attempt to have the Court decide on a case-by-case basis if video games should be protected, Defendants proclaim that certain games should be excepted from constitutional protection because they "provide nothing more than depictions of death scenes." (Id.) This argument is unavailing, because even the video games that Defendants provided for the Court to review "involve intricate, if obnoxious, story lines," regardless of the subject matter. See Maleng, 325 F. Supp. 2d at 1184. As the Eighth Circuit has noted, whether the Court "believe[s] the advent of violent video games adds anything of value to society is irrelevant," because they are just as entitled to First Amendment protection as is the finest literature. IDSA, 329 F.3d at 958; see also Maleng, 325 F. Supp. 2d at 1184 (noting that it was "the nature and effect of the message being communicated" that prompted the government to regulate).

---

[3] In fact, the only case cited in James as holding that video games were not protected expression was the district court case reversed by IDSA, 329 F.3d 954.

*2. Constitutional Violation*

Having determined that video games are entitled to constitutional protection, the next issue is whether the Act violates the First Amendment. Defendants claim that the Court could not "impanel a group of responsible adults who could view these 'games' and conclude they are suitable for children." (Defs.' Resp. at 8.) Having viewed the portions of three games submitted by Defendants, the Court is inclined to agree. Whether the games are "suitable," however, is not the applicable standard for the propriety of the government placing a content-based restriction on dissemination of protected speech, even dissemination to minors.

Because the Act applies only to video games and software containing "inappropriate violence," its provisions constitute a content-based regulation on protected expression. See IDSA, 329 F.3d at 958; Blagojevich, 404 F. Supp. 2d at 1071. Hence, the attempted regulation is presumptively invalid and subject to the strictest scrutiny under the First Amendment. R.A.V. v. City of St. Paul, 505 U.S. 377, 382, 395 (1992). Under this analysis, the Act will be upheld only if Defendants can show that the regulation is necessary to serve a compelling state interest. Id. at 403. Strict scrutiny also requires that the Act be narrowly tailored to achieve that interest. Id. The fact that Defendants are attempting to regulate the flow of information to minors, rather than to adults, does not render the values protected by the First Amendment any less applicable. Erznoznik v. City of Jacksonville, 422 U.S. 205, 214 (1975). To the best of the Court's knowledge, the Supreme Court has not "suggest[ed] that the government's role in helping parents to be the guardians of their children's well-

7

being is an unbridled license to governments to regulate what minors read and view." IDSA, 329 F.3d at 959-60; see also Blagojevich, 404 F. Supp. 2d at 1076.

Defendants offer two bases for their argument that because the Act's provisions are reasonable and aimed at protecting minors' well-being, a strict scrutiny level of analysis is not required. First, Defendants submit that the standard of Ginsberg v. New York, 390 U.S. 629 (1968), should apply and allow the government to regulate objectionable depictions in the interest of helping parents with "protecting minors." (See Defs.' Resp. at 6, 10.) The Supreme Court in Ginsberg permitted enhanced regulation of distribution of sexually explicit material that is obscene as to minors but not obscene as to adults. Ginsberg, 390 U.S. at 636-40. The Ginsberg decision, however, concerned only sexually explicit or "obscene" material, which is unprotected by the First Amendment, rather than the protected expression at issue in this case. See Miller v. California, 413 U.S. 15, 23 (1973). The Supreme Court has held that, when used in the context of the First Amendment, the word "obscenity" refers only to works that deal with sex. Maleng, 325 F. Supp. 2d at 1185 (citing Miller, 413 U.S. at 24 ("[W]e now confine the permissible scope of [regulation of obscene material] to works which depict or describe sexual conduct.")).  It is immaterial that the subject matter of the video games could be characterized as "disgusting or degrading." (Defs.' Resp. at 8).  No court has expanded the definition of obscenity to include portrayals of violence, "inappropriate" or otherwise; each is a "distinct categor[y] of objectionable depiction." Kendrick, 244 F.3d at 574 (declining to "squeeze" a provision regarding violence into the "familiar legal pigeonhole" of sex and noting that the fact that obscenity is excluded from protection against

content-based regulation neither compels nor forecloses a like exclusion of violent imagery); Maleng, 325 F. Supp. 2d at 1185.  In contrast to Ginsberg, the Act in the instant case is attempting to regulate protected expression.  Therefore, Defendants may not rely on Ginsberg as authorizing the enhanced restrictions of the Act on dissemination to minors.  See IDSA, 329 F.3d at 959-60; accord Granholm, 426 F. Supp. 2d at 652; Blagojevich, 404 F. Supp. 2d at 1075-76; Maleng, 325 F. Supp. 2d at 1185-86.

Second, Defendants present a seemingly novel argument and cite United States v. Am. Library Ass'n, Inc. (ALA), 539 U.S. 194, 195 (2003) (plurality opinion), for the proposition that the government may make "reasonable restrictions in content-based judgments on private speech."  (Defs.' Resp. at 11.)  Defendants argue that because "[r]estrictions are reasonable where children are concerned," the Act is valid despite a "slight inconvenience" to adults.  (Defs.' Resp. at 11.)  Unfortunately for Defendants, even if the latter two statements were correct, the holding of ALA is inapposite to, and does not authorize, government restrictions on private speech.  In ALA, a plurality of the Supreme Court recognized that staff members could place reasonable restrictions on material available in a public library.  ALA, 539 U.S. at 204-05.  In doing so, the Supreme Court did indeed recognize "that the Government has broad discretion to make content-based judgments in deciding what private speech to make available to the public," id. at 204, but that principle was applied in the context of a public library's exercise of judgment in filtering the internet material it provided to patrons.  Defendants argue that "the point is quite similar to" the one in this case.  (Defs.' Resp. at 11.)  Whatever they may mean by "the point," from a First

Amendment perspective the government's ability to filter information made available in a public library is actually quite dissimilar from a desire to place content-based restrictions on protected private expression. Defendants have provided no case law or other support for their contention that <u>ALA</u> applies to government restrictions on private speech, and such an application would conflict with numerous cases which have applied strict scrutiny to content-based restrictions on video games. <u>See, e.g.</u>, <u>IDSA</u>, 329 F.3d at 958.

### a. Compelling State Interest

Defendants repeatedly characterize the government's interest in the Act as "prevent[ing] access of minors to video games containing inappropriate violence." (<u>See</u> Defs.' Resp. at 1, 3, 4, 11.) Restricting access to these games, however, is not a purpose but rather a means to an end, as Defendants themselves admit. (<u>See</u> <u>id.</u> at 11.) The only semblance of a compelling interest or recited harms by Defendants is their contention that the Act promotes "the well-being of [the State's] youth" and "protect[s] its children" from violent video games' harmful effects, which it characterizes as a "significant" interest. (Defs.' Resp. at 6, 11-12.) The Court will address each of these interests and its applicable standard in turn.

### i. Curbing Violent Behavior

To the extent that Defendants argue they are regulating expression to curb minors' violent behavior, they must satisfy the standard set forth in <u>Brandenburg v. Ohio</u>, 395 U.S. 444 (1969). <u>See</u> <u>Foti</u>, 451 F. Supp. 2d at 831. In <u>Brandenburg</u>, the Supreme Court held that the First Amendment does "not permit a State to forbid or proscribe advocacy of the use of

force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."  395 U.S. at 447. Nothing submitted by Defendants shows that the "advocacy" in violent video games is directed to inciting or producing imminent lawless action, or that it is likely to do so.  Thus, Defendants have not met the requirement set forth in Brandenburg, and they cannot justify the Act's content-based restrictions on the ground that such restrictions serve to curb violent behavior.  See Schwarzenegger, 2007 WL 2261546, at * 4; Foti, 451 F. Supp. 2d at 831-33.

*ii. Protecting Minors' Well-being*

The Court does not question that the government's interest in protecting the physical and psychological well-being of minors is compelling in the abstract.  Cf. IDSA, 329 F.3d at 958.  However, "[s]imply identifying a compelling state interest" is insufficient:

> When the Government defends a regulation on speech as a means to . . . prevent anticipated harms, it must do more than simply "posit the existence of the disease sought to be cured." It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way. . . .
>
> Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 664-65, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).  If the state is able to show that the psychological well-being of [its] youth is in genuine jeopardy, it has the additional burden of showing that the regulation is narrowly tailored to address that problem without unnecessarily interfering with First Amendment freedoms.
>
> . . . .
>
> In general, courts must "accord substantial deference to the predictive judgments" of the legislature.  Where the challenged legislation restricts or limits freedom of speech, however, the courts must ensure that the legislature's

11

judgments are based on reasonable inferences drawn from substantial evidence.

Maleng, 325 F. Supp. 2d at 1187 (citations omitted).

There is no support in the record, let alone "substantial evidence," for Defendants' conclusion that allowing dissemination of violent video games to minors is harmful to those minors or any others. Beyond Defendants' generalized statements, there is a complete dearth of legislative findings, scientific studies, or other rationale in the record to support the passage of the Act.[4] Defendants' argument that "common sense" dictates that playing violent video games "is not good for children," and that the onus is on Plaintiffs to prove otherwise, completely fails. (See Defs.' Resp. at 9.) The First Amendment does not allow prohibitions based on "common sense." See Kendrick, 244 F.3d at 578; Granholm, 426 F. Supp. 2d at 663-64. The government may not limit minors' exposure to creative works based on a general belief that they may be psychologically harmful, absent substantial evidence. See IDSA, 329 F.3d at 959. And as much as Defendants may wish otherwise, Plaintiffs are not required to present a study showing that the video games "are good for children." (See Defs.' Resp. at 9.)

The burden is squarely on Defendants, not Plaintiffs, to demonstrate that the Act is necessary to serve a compelling state interest and will materially and directly alleviate the

_____

[4] Even had such studies or findings been submitted, courts generally have found even extensive research purporting to show violent video games' harmful effects to be tenuous, speculative, and uncompelling in any case. See, e.g., Blagojevich, 404 F. Supp. 2d at 1074-75; Maleng, 325 F. Supp. 2d at 1186-89.

recited harms better than the existing law.  IDSA, 329 F.3d at 958.   Other courts have expressed doubts that singling out video games sufficiently advances the alleged goal of protecting the interests of minors, as violent video games make up "only 'a tiny fraction of the media violence to which modern American children are exposed.'"  Foti, 451 F. Supp. 2d at 833 (quoting Kendrick, 244 F.3d at 579 (discussing games played in public places)). A minor who is prevented by the Act from buying or renting a video game containing "inappropriate violence" may still legally buy or rent the book or movie on which the game was based.  See id.; Granholm, 426 F. Supp. 2d at 654.  As other courts have noted, "this type of facial underinclusiveness undermines the claim that the regulation materially advances its alleged interests."  Foti, 451 F. Supp. 2d at 833; see also Schwarzenegger, 2007 WL 2261546, at *11 (noting the evidence did not show that video games were "any more harmful than violent television, movies, internet sites or other speech-related exposures"). For the Court to accept Defendants' broad, unsubstantiated interest as compelling and that the Act materially advances that interest "would be to invite legislatures to undermine the [F]irst [A]mendment rights of minors willy-nilly under the guise of promoting parental authority."  See IDSA, 329 F.3d at 960.

### b. Narrowly Tailored

Even presuming that Defendants could demonstrate a compelling state interest, Defendants fail to make the required showing that the Act is narrowly tailored to materially advance that interest without unnecessarily interfering with First Amendment freedoms.  See Maleng, 325 F. Supp. 2d at 1186, 1189; Granholm, 426 F. Supp. 2d at 654.

In support of their argument that the Act is narrowly tailored, Defendants make several claims that are highly misleading, to wit:

- The Act "does not prevent access by adults to any video 'game,' but rather, simply requires retailers to limit accessibility of minors to games."

- "The Act places the wholly reasonable burden on adults to make their purchase[s] among 'blinder racks[.'] The inconvenience to adults is thereby remarkably limited. . . . They must simply go to that portion of a store where violent video games are kept.

- "The Act restricts only an unsupervised minor's right to purchase these games."

(Defs.' Resp. at 3, 9, 11.)   Clearly Defendants are defying reality to claim that the Act restricts only an unsupervised minor's right to purchase games.  (See id. at 9.) Oklahoma law prohibits any "person" – which includes any individual, partnership, association, corporation, or other legal entity – from selling, furnishing, presenting, distributing, allowing to view, or otherwise disseminating to any unmarried person under the age of eighteen any material that is "harmful to minors."   21 Okla. Stat. §§ 1040.75-.76.   As amended by the Act, the definition of "harmful to minors" would include any description, exhibition, presentation, or representation, in any form, of "inappropriate violence."   Under Defendants' version of events, the effect of the Act is to simply require storekeepers to sell violent video games to adults separately from those without "inappropriate" violence and via the use of blinder racks.  It is similarly wishful thinking to claim that the entire "wholly reasonable burden" of the Act lies on adults wishing to purchase games from blinder racks. (Defs.' Resp. at 9.) By its own terms, the Act's influence on existing law is much greater than simply regulating the display and sale of video games to minors in retail stores.

Defendants' argument regarding the Act's purpose of supporting parents' claim to authority also is defeated by the broad scope of the Act.  In <u>Ginsberg</u>, for example, the Supreme Court emphasized that the prohibition on sales of obscene materials to minors in that case did not prohibit parents from purchasing such items for their children if they wished.  390 U.S. at 639.  The Act in this case, however, penalizes dissemination even by parents and teachers to any minor, supervised or not.  <u>See</u> 21 Okla. Stat. § 1040.76.  Enforcement of the provisions of the Act likewise would presumably lay penalties on parents, guardians, and others lying far outside the sphere of retail.[5]  Thus, the language of the Act undermines Defendants' argument that the Act would assist parents, because the Act in reality would serve to punish parents who choose to disseminate materials to a minor that describe, exhibit, present, or represent "inappropriate violence."  <u>Cf.</u> <u>Kendrick</u>, 244 F.3d at 578 (rejecting defendants' argument that video games' "contribution to the marketplace of ideas and expression" is secured by the parent's, guardian's, or custodian's right to allow his or her child to play the games despite regulation); <u>Blagojevich</u>, 404 F. Supp. 2d at 1076 (rejecting argument that the limitations on selling and renting video games were narrowly tailored because they did not restrict adults' rights "to buy or rent these materials for themselves or their children").

The Act "does not satisfy the rigorous constitutional standards that apply when government attempts to regulate expression.  Where First Amendment freedoms are at stake

---

[5]  The Act's effect on retailers and product availability is more fully discussed in regards to the vagueness of the Act, <u>infra</u>.

. . . precision of drafting and clarity of purpose are essential.  These prerequisites are absent here."  Erznoznik, 422 U.S. at 217-18.[6]

*B. Fourteenth Amendment - Vagueness*

Plaintiffs additionally claim that the Act is unconstitutionally vague and would restrict a broader range of expression than contemplated by the government.  (Pls.' Br. at 15.) Because people will have to guess at the meaning and scope of the Act, Plaintiffs assert that "broad swaths of protected expression will be self-censored."  (Id. at 19.)  Defendants support their contention that the Act is not unconstitutionally vague by claiming that all of its terms "are terms or words of common usage that are routinely found in everyday dictionaries."  (Defs.' Resp. at 3.)

It is not necessary to delve into what is "common usage" or an "everyday" dictionary, because that is not the standard the Court must apply.[7]  Rather, the Constitution requires that

---

[6] The Court must strike down speech restrictions "[i]f a less restrictive alternative would serve the [g]overnment's purpose."  United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 813 (2000). Defendants attempt to create a genuine fact issue by noting that Plaintiffs agreed to delete references to the voluntary Entertainment Software Rating Board ratings system from their motion, and thus they argue no less restrictive alternative is before the Court and so the Act must be narrowly tailored.  (See Defs.' Resp. at 1, 3, 10.)  Even without consideration of that ratings system, parental controls, or other plausible less restrictive alternatives, however, as discussed in this opinion the Act does not meet the remaining requirements of strict scrutiny analysis and therefore is invalid and unenforceable.

[7] In addition to being void for vagueness because "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," a statute may be unconstitutionally void "if it authorizes or even encourages arbitrary and discriminatory enforcement."  Hill v. Colorado, 530 U.S. 703, 732 (2000).  Although Plaintiffs challenge the Act only on the first criterion, several courts have noted that unconstitutional vagueness in violent video games statutes left them "open to subjective interpretation and enforcement."  See, e.g., Blagojevich, 404 F. Supp. 2d at 1077.

the Act "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." Kolender v. Lawson, 461 U.S. 352, 357 (1983). Such precision is necessary to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). The vagueness of a content-based regulation of speech "raises special First Amendment concerns because of its obvious chilling effect on free speech," especially where the regulation imposes criminal penalties. Reno v. Am. Civil Liberties Union, 521 U.S. 844, 871-72 (1997).

Plaintiffs' primary criticism regards the list of nine non-exclusive criteria that the Act appends to help determine whether material describes, exhibits, presents, or represents "inappropriate violence."[8] Nowhere in the Act or the statutes it amends does there appear a definition of "interactive video game," nor explanation of many of the terms that appear in these criteria, including: "graphic," "glamorized," "gratuitous," "realistic violence," or "brutal weapons." The Act does not explain how an ordinary person can discern whether violence in an imaginary electronic world constitutes "graphic violence" that is "used to shock or stimulate" or "is not contextually relevant to the material." See H.B. 2004 § 2(3)(b); cf. Maleng, 325 F. Supp. 2d at 1190-91 ("Would a game built around The

---

[8] As additional grounds for vagueness (and on a related note to their First Amendment argument), Plaintiffs argue that the Act improperly extends Ginsberg's "harmful to minors" doctrine to non-obscene violent material. (See Pls.' Br. at 18 n.8; H.B. 2004 § 2(2)(b)); see also Granholm, 426 F. Supp. 2d at 656 ("[T]he 'harmful to minors' standard for sexually explicit speech cannot be expanded to cover depictions of violence." (citing Ginsberg)). Because the Court finds that the Act is unconstitutionally vague on account of its undefined criteria, however, it is not necessary to address these grounds.

Simpsons or the Looney Tunes characters be 'realistic' enough to trigger the Act?");

Schwarzenegger, 2007 WL 2261546, at *10 ("[S]ome terms such as 'image of a human

being' are broad and not sufficiently narrow.").  While in theory certain issues could be

determined by state courts, there is a substantial risk that "First Amendment rights would be

chilled while each issue of interpretation is presented."  See Maleng, 325 F. Supp. 2d at

1191.

Defendants argue that "[i]t begs reason to assume that merchants cannot understand"

the terms of the Act when they are able to run their businesses.  (Defs.' Resp. at 6.)

Understanding how to run a video game store, however, is vastly different from

comprehending the legal niceties of the Act.  As other courts have noted, if video game

retailers or rental stores are subjected to criminal liability for guessing wrongly about what

games contain "inappropriate violence,"

> [they] will respond by either self-censoring or otherwise restricting access to
> any potentially offending video game title.  In turn, it is possible that authors
> and game designers will "steer far wider of the unlawful zone . . . than if the
> boundaries of the forbidden area were clearly marked."  Such behavior will
> deprive access to such expression by adults as well as minors.

Granholm, 426 F. Supp. 2d at 656 (second alteration in original) (citations omitted); see also

Blagojevich, 404 F. Supp. 2d at 1077.  Moreover, given the vagueness and subjectivity of the

terms in the Act, a retailer "might know everything there is to know about the game and yet

not be able to determine whether it can legally be sold to a minor."  Maleng, 325 F. Supp.

2d at 1191.

18

Defendants emphasize that there is "a reasonable belief defense built into the statute for the unwary clerk." (Defs.' Resp. at 12.)[9] From the language of the statute it is not certain that the defense actually would exonerate someone who made an honest mistake regarding the contents of the video game but had no reason to attempt to ascertain the age of the minor. However, because the Court finds that the definition of "inappropriate violence" is unconstitutionally vague, it does not need to reach the question of the applicability or vagueness of the defense.  See Blagojevich, 404 F. Supp. 2d at 1076.

The Act fails to withstand the challenge that it is unconstitutionally vague, providing an additional reason to grant summary judgment for Plaintiffs.

## IV. CONCLUSION

As outlined herein, the Act constitutes an unlawful regulation, and Defendants have not demonstrated any genuine factual issue that would necessitate a trial on the merits of this case.  Plaintiffs' motion for summary judgment (Dkt. No. 35) is therefore GRANTED.  The

---

[9] As previously noted, the Act does not apply only to "clerks"; Oklahoma law as amended by the Act prohibits any "person" from knowingly disseminating "inappropriate violence" to minors.  Defendants provide no further citation and the Court is unable to find the phrase "reasonable belief" anywhere in the relevant chapter of Title 21 of the Oklahoma Statutes.  Presumably, Defendants are referring to these previously enacted provisions:

"Knowingly" means having general knowledge of, or reason to know, or a belief or ground for belief which warrants further inspection or inquiry of both:
a. the character and content of any material or performance which is reasonably susceptible of examination by the defendant, and
b. the age of the minor.  However, an honest mistake, shall constitute an excuse from liability pursuant to this act if the defendant made a reasonable bona fide attempt to ascertain the true age of such minor[.]

21 Okla. Stat. § 1040.75(13) (footnote omitted).  A "reasonable bona fide attempt" is defined as "an attempt to ascertain the true age of the minor . . . and not relying solely on the oral allegations or apparent age of the minor."  Id. § 1040.75(15).

Court finds that the portion of H.B. 3004 amending 21 Okla. Stat. § 1040.75 violates the United States Constitution and that it must be set aside; therefore, any enforcement of it is enjoined.  A separate judgment shall issue accordingly.

 

IT IS SO ORDERED this 17th day of September, 2007.


ROBIN J. CAUTHRON
United States District Judge